**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO. 10-41418-H5-11** |
| | § | |
| **NADOWESSIOUX PROPERTIES, LTD.** | § | **(Chapter 11)** |
| | § | |
| **DEBTOR** | § | |

### BONTECOU'S MEMORANDUM IN SUPPORT OF ITS CLAIM – NATURE OF UNDERLYING CONTRACT
(Related to Docket No. 50)

**TO THE HONORABLE KAREN K. BROWN, U. S. BANKRUPTCY JUDGE:**

COMES NOW, Bontecou Construction, Inc., ("***Movant***" and/or "***Bontecou***"), a creditor in the above-captioned bankruptcy case, and files its *Memorandum in Support of Its' Claim – Nature of Underlying Contract* and respectfully shows to the Court as follows:

### OVERVIEW

Nadowessioux created and is bound by two contracts to pay for the construction of the Lot 1 Amangani Villa.  The parties entered a standard form contract in August 2006.  Under that contract and bid, Nadowessioux was going to build an "Isuzu" or less expensive version of the Villa.  Nadowessioux redesigned the Villa to a "Cadillac" model and issued new plans in December 2006, after the parties signed the original contract.  Nadowessioux's creation of those new plans and redesign of the Villa, the parties' course of conduct surrounding the new "Cadillac" design, and Bontecou's construction of the December 2006 "Cadillac" plans, created an implied-in-fact contract that also obligates Nadowessioux to pay for the work that Bontecou Construction performed.

## **SHORT SUMMARY**

Nadowessioux's agent, Charles Haden, does anything and everything to advantage himself even when it is unfair.  He resorts to every device to try avoid paying  for work he has ordered.   Nadowessioux's representatives, Charles Haden and Shelley Haden decided they wanted a multi-million dollar second home in Jackson Hole, Wyoming.   They found an unfinished house, an Amangani Villa at the Amangani Resort in Jackson, Wyoming. The Lot and unfinished Villa had been through foreclosure and were in the redemption period. Nadowessioux got a great price on the real estate and the unfinished Villa.

Prior to Nadowessioux's purchase, the Villa had sat empty for approximately two years while the prior owner struggled with financial problems. See, Affidavit of Steve Bontecou., Exhibit C. Nadowessioux asked Bontecou Construction to bid on finishing the Villa.  While putting together its bid, Bontecou Construction made clear to Nadowessioux's agent that Bontecou's bid would not include repairs[1] of items that could not be seen but were needed either because prior contractors had performed deficient work or because the property had been empty for two years.  See, Affidavit of Steve Bontecou, Exhibit C.

Bontecou Construction's bid was based on and expressly referenced the Galambos 2003 architectural plans.  See, Affidavit of Steve Bontecou, Exhibit C.  The parties agreed on a guaranteed maximum price of $3,117,383.00 that was dependent upon the Galambos 2003

---

[1] Bontecou Construction did include in its bid funds to repair certain problems that were visible to the naked eye but made clear it was not responsible for hidden defects or prior defective work. Exhibit C; Exhibit F.

architectural plans being built and provided that any changes or additions by the owner would be on top of the Guaranteed Maximum Price.[2]

Based on Nadowessioux's commitment to build the pre-existing Galambos 2003 plans, the parties signed a contract and Bontecou Construction agreed to build the house in 242 days. An important part of the parties' agreement was that Nadowessioux would finish "House A," as shown on the Galambos 2003 plans, the basis of Bontecou Construction's bid.

After Bontecou Construction had begun work, the Hadens, on behalf of Nadowessioux, asked John Galambos to redesign the Villa. Nadowessioux's architect redrew and redesigned substantial portions of the Villa beginning in October of 2006. Nadowessioux's architect provided the new plans to Bontecou Construction in approximately December 2007[3].

Bontecou's bid price was to build "House A (the Isuzu model)," as shown on the Galambos 2003 plans. Nadowessioux through its representatives redesigned the Villa and directed Bontecou Construction to essentially build a different Villa, "House B (the Cadillac model)," based on new Galambos December 2006 plans. The new December 2006 plans, plus a series of additional sketches issued by Galambos, increased the price and increased the time needed to finish the Villa. The Villa went from an "Isuzu" to a "Cadillac." Nadowessioux is obligated to pay for the additional work because Nadowessioux's agents requested and directed the additional work and confirmed their agreement to pay for the work by their actions.

---

[2] The contract also had a shared savings clause but the shared savings clause was not triggered. *See, Affidavit of Steve Bontecou,* Exhibit C.

[3] Nadowessioux's architect produced a redesigned set of plans in December 2006 and continued to issue additional sketches and drawings throughout construction.

Nadowessioux's estate would be unjustly enriched if Bontecou were not paid in full for the work it performed.

Further, Nadowessioux made an offer for an implied-in-fact contract when it redesigned the Villa and had a new set of plans created in December of 2006. Bontecou Construction accepted Nadowessioux's offer when it built the new plans. Nadowessioux, through its agents, supervised the additional work based on the new plans. Nadowessioux directed the additional work in writing via e-mails. Exhibit G. Nadowessioux received frequent notice that Bontecou Construction was performing the agreed upon new work including, but not limited to: monthly progress reports which confirmed the progress of the new work, cost estimates in advance of the new work, monthly bills with additional charges for the new work and summary reports detailing the cost of the additional work to date. See Exhibit G; Exhibits Confirming Construction of the New Plans, Exhibit C. Nadowessioux paid the invoices for the new work from Bontecou month after month as the additional work went forward. Exhibit E. Nadowessioux's actions, course of conduct and written correspondence confirms that Nadowessioux designed and directed the construction of a much more expensive Villa. Wyoming law[4] requires that Nadowessioux pay for the same.

---

[4] The Galambos 2003 plans were created for the prior owner Remko Van Lent who was running out of cash to complete the Lot 1 Villa. Remko asked Galambos to make the design less costly and the Galambos 2003 plans represent, essentially, an Isuzu. The Hadens' then, in 2007, after signing the contract with Bontecou Construction asked Galambos to redraw and change the Isuzu to a Cadillac. Given the redesign was done at the direction of Nadowessioux' principals, Nadowessioux under the contract and under Wyoming law must pay for the work performed by Bontecou Construction at their direction and for their benefit

# CONTENTS OF THE PARTIES' AGREEMENTS

### 1.  THE PARTIES ORIGINAL AGREEMENT--A111-1997 with Signed and Incorporated Addenda

The parties entered into a standard AIA Form A111 Contract on August 28, 2006. Exhibit A. The form of contract is a "Cost of the Work Plus a Fee with a negotiated Guaranteed Maximum Price." Exhibit A.  That Guaranteed Maximum Price of $3,117,383  was based on a Job Cost Estimate dated July 26, 2006.  Exhibit A, Section 15.1.7; Job Cost Estimate, attached to Exhibit A.  The Job Cost Estimate is sometimes referred to as the bid.  Addendum 1 contains provisions such as a shared savings clause which would have been activitated had Nadowessioux elected to build a less expensive house.  However, Nadowessioux designed and had built a more expensive house than priced in the Job Cost Estimate and these provisions were not triggered.  See Affidavit of Steve Bontecou, Exhibit C.

### Expressly Incorporated Plans—Addendum 2

The Parties' August 28, 2006 Agreement expressly incorporates and the November 2003 Plans by Galambos Architects.[5]  The Job Cost Estimate and price in the Parties' original agreement were based upon building the 2003 Galambos plans.  Nadowessioux chose to redesign the Villa after the contract was signed.  At Nadowessioux's direction, Galambos created a new design and the new plans, the December 2006 plans which were the plans that were built in

---

[5] The Parties' Agreement also references the original plans for the Lot 1 Villa which were drawn by San Francisco architects—Patri Merker.  The Patri Merker plans served as the original design and were used to build the exterior walls and other components.  The Parties' Agreement provides that the Galambos 2003 plans supersede the Patri Merker plans.   In 2003 when Remko Van Lent was struggling financially he had Galambos Architects make the project less expensive which resulted in the "Isuzu" plans.

finishing the Villa.  Nadowessioux's actions in having new plans drawn after the parties' original agreement waived the Guaranteed Maximum Price in the original contract.

2. **Nadowessioux's Redesign of the Villa resulted in Waiver of the GMP as a matter of law**

Many courts recognize that when an Owner submits new plans after the bid, the original contract price is modified.  *C. Norman Peterson Co. v. Container Corp. of America,* 218 Cal.Rptr. 592 *(*Cal.App.1.Dist.,1985)(Evidence that change orders and extra work imposed by owner upon contractor were of such magnitude as to change scope of work originally contemplated under construction contract was sufficient to support finding that parties had abandoned original contract); *In re Schanzer's Estate,* 182 N.Y.S.2d 475 (N.Y.App.Div.1.Dept.,1959)(A contract duly executed and thereafter abandoned or ignored by the contracting parties is unenforceable and an abandonment may be inferred from the conduct of the parties and the attendant circumstances).

In circumstances similar to this case, where the owner had waived the written contract terms on deadlines and written change orders, the owner had made significant changes in the project, and the contractor had substantially performed the contract as Bontecou had, the court concluded that the contractor should recover for the completed work.  Cleveland Neighborhood Health Serv., Inc. v. St. Clair Builders, Inc., 64 Ohio App.3d 639, 582 N.E.2d 640, 645 (Ohio App. 8 Dist.,1989).  An important factor in Cleveland Neighborhood was that the Owner had full knowledge of the additional work and challenges experienced throughout the construction. Id. The same is true here and the same result should apply.  Nadowessioux should be obligated to

pay for Bontecou's work to build the Lot 1 Villa.

Nadowessioux did not claim that the work to build the new plans that Nadowessioux created after the contract was signed was covered by the GMP.  See Affidavit of Steve Bontecou, Exhibit C.  Instead, Nadowessioux repeatedly received notice that Bontecou Construction viewed the work to build the new plans as extra and Nadowessioux received notice that Bontecou expected additional compensation for doing the extra work.  Nadowessioux received this written notice through price estimates that Bontecou routinely provided to complete the new work and Nadowessioux received notice through written change orders.  See Affidavit of Steve Bontecou, Exhibit C.  Nadowessioux provided detailed written change order summary reports in January 2007, June 2007, September 2007, November 2007 and February 2008.   Courts considering similar circumstances have ruled that contractor is entitled to recover for performing the extra work.  Biederbeck v. Marbut, 670 S.E.2d 483 (Ga.App. 2008).

Nadowessioux's course of conduct in directing and implementing the new design justifies a finding that Nadowessioux abandoned the price limitation in the contract and proceeded on a straight cost basis and Bontecou Construction is permitted to recover for the extra work it performed.  Opdyke & Butler v. Silver, 245 P.2d 306 (Cal.App.3.Dist. 1952).  See also, River Oaks, Inc. v. Blue Cross of Louisiana/Louisiana Health Service & Indem. Co., 595 So.2d 785 (La. App.5.Cir., 1992).  The Wyoming Supreme Court has recognized that "(a) s a general rule, if the parties mutually adopt a mode of performing their contract differing from its strict terms or if they mutually relax its terms by adopting a loose mode of executing it, neither party can go back upon the past and insist upon a breach, because it was not fulfilled according to its letter."

*PBS Enterprizes, Inc. v. CW Capital Asset Management LLC*, 2008 WY 53 ¶9, 183 P.3d 1140, 1142 (Wyo. 2008); *Forshee v. Delaney*, 2005 WY 103 ¶8, 118 P.3d 445, 449 (Wyo. 2005); *Ruby Drilling Co. v. Duncan Oil Co.*, 2002 WY 85;47 P.3d 964, 968-69 (Wyo. 2002); *Roussalis v. Wyoming Med. Center, Inc.*, 2000 WY 98, 4 P.3d 209, 240 (Wyo. 2000); *Harvard v. Anderson*, 524 P.2d 880 (Wyo.1974).

Under the parties' original contract, change orders prepared by the owner's architect were supposed to be the method for making increases to the contract price.  Exhibit F.  Nadowessioux did not direct its architect to submit any change orders and Nadowessioux did not sign any of the change orders that Bontecou Construction presented.  Nadowessioux chose the new work and design and continued to expressly direct Bontecou Construction to do the work by virtue of providing new plans, directing more work through additional sketches provided by Nadowessioux's architect throughout the project and providing authorization to do the new work via Nadowessioux's architect and direct authorization to Bontecou Construction via telephone and electronic correspondence.  See Exhibit G ; Affidavit of Steve Bontecou, Exhibit C. Nadowessioux also continued to authorize the additional work and by virtue of written notice via e-mail, and Nadowessioux had express written notice of the additional cost through  price estimates for new work, detailed change order summaries and monthly pay applications.  Exhibit G. When an owner has authorized the work being done, had notice of and knew the work was being done, and accepted the benefits of the work, and the Owner does not adhere to the method for authorizing changes provided by the contract, the owner has waived the change order procedure in the contract is obligated to pay for the additional work it ordered.  *Smith-Hunter*

_Const. Co., Inc. v. Hopson,_ 616 S.E.2d 419 (S.C. 2005).

3. **Contract to Build the Redesigned Villa**

Nadowessioux's obligation to pay for the redesigned Villa is clear from the  project documents and the parties' communications during the construction of the Villa.  In similar circumstances, courts have found that the Owner created an implied-in-fact contract for the additional work.  In _Uhrhahn Const. & Design, Inc. v. Hopkins,_ 179 P.3d 808 (Utah.App. 2008). In _Uhrhahn_, the court found an implied-in-fact contract existed between the owner and the contractor that permitted changes to be made orally, rather than in writing.  _Uhrhahn_ at 814-815. The court also found that the owner breached the implied-in-fact contract when the owner failed to pay the contractor for extra work the contractor had performed and the owner had repeatedly asked the contractor to perform work that deviated from the agreement.  _Id._  The other critical fact in _Uhrhahn_ which resulted in a decision in favor of the contractor that should cause the same result here, is that the owner's conduct showed that the owner knew the contractor expected to be paid and the owner paid invoices for additional work at the same time the owner had knowledge of the extra work included in those invoices. _Uhrhahn_ at 814.

The court recognizes that changes such as these regularly occur in construction contracts. Rather, it is the "rare case in which parties to [construction] contracts do not find reason for variation or addition after the work is in progress. The owner changes his mind and the architect gives new directions. It is universal custom to rely upon the spoken word in such cases; the oral modification is enforced and compensation for "extra work" adjudged." _Urhahan_ at 814.

The implied in fact contract is also bolstered by Bontecou's quantum meruit claim and the parties' conduct:

> . . . the trial court correctly determined that an implied-in-fact contract was established through the parties' conduct, which allowed the parties to agree on extra work orally. *See id.* (concluding that when "the parties decide on extras," as happened in that case, "another contract in quasi contract arises based on a so-called quantum meruit theory").

> A contract implied in fact is the second branch of quantum meruit. A contract implied in fact is a "contract" established by conduct. The elements ... are: (1) the defendant requested the plaintiff to perform work; (2) the plaintiff expected the defendant to compensate him or her for those services; and (3) the defendant knew or should have known that the plaintiff expected compensation. *Uhrahahn* at 815.

The Court can make factual findings to recognize an implied in fact contract.

> [T]he trial court's factual findings show that the parties' conduct established an implied-in-fact contract. The trial court found that Hopkins "made several requests for additional work to the home," and that "Uhrhahn ... completed a substantial amount of the additional work requested." Additionally, the trial court stated that Hopkins "accept[ed] the benefits of [Uhrhahn]'s hard work." Moreover, Hopkins paid at least three different invoices for the additional work, which invoices itemized the extra (or additional) work performed by Uhrhahn. *Urhahan* at 815.

The same evidence is present here. Nadowessioux paid invoices for additional work throughout the construction of the Amangani Villa and all the while Nadowessioux had been given change order summary reports that contained itemized listings of the costs of the additional work. See Affidavit of Steve Bontecou; Exhibit C; and Exhibit G.

Nadowessioux's creating a new design and new plans after the bid created another contract between the parties. Not being an uncommon scenario in contract law, "Wyoming law

recognizes that parties to a written contract can orally amend that contract, even when the language of the contract seeks to preclude that very thing." *Forshee v. Delaney*, 2005 WY 103 ¶ 8, 118 P.3d 445, 449 (Wyo. 2005).

Nadowessioux's course of conduct in requesting additional work and having knowledge of and paying for additional work is unmistakeable and undisputed.  Exhibit G  is a detailed history of the project by month.  The pattern that takes place in the first few months of the project was repeated throughout the project.  The next paragraph contains a detailed description of those events and actions by Nadowessioux during a few of the months.  If one described each month of the construction of the Villa, the same pattern is evident. Exhibit G.  The text below demonstrates the pattern over the course of a few months.  The attached Exhibit G contains the monthly documentation from the construction of the Villa and demonstrates the same pattern throughout the project.  Exhibit G.

Beginning in October 2006, Nadowessioux via the Hadens' received progress reports describing in detail the work on the Villa.  The progress reports confirm that Nadowessioux was aware of the changes that Nadowessioux had directed and was continually informed about the progress of the new work. Exhibit C; Exhibit G, BCI00002.   Likewise, the e-mail correspondence also confirms Nadowessioux's knowledge and agreement surrounding additional work. Exhibit G, *See, e.g., October 23, 2006 E-mail from Charles Haden on behalf of Nadowessioux recognizing additional work from new plans,* Bates Page NumberBCI00008.

The progress report for October 26, 2006 that Nadowessioux received references the architect's new plans and broken items and errors in prior construction.  The Owner was kept

apprised of the damage that occurred because the Villa sat empty and unfinished for two years and additional cost to repair the damage.  Exhibit G;  *See, e.g. E-mail from Terry Ross to Charles Haden dated October 31, 2006, Bates Page Number BCI00008.*  Confirming e-mails from Nadowessioux's representatives continued during construction of the Villa. Exhibit G; *See e.g. December 11, 2006 E-mail from Nadowessioux's representative to his architect (To Architect John-"great job in capturing all the finite details in your latest architectural drawings."), Bates Page Number BCI000014-15 .*  The Owner authorized and supervised the changes throughout the project.   Exhibit G;  *See, e.g. December 15, 2006 E-mail from Charles Haden giving authorization to proceed with a particular change namely insulating the media room with soft foam, Bates Page Number BCI000022.*  This pattern continued throughout the project wherein changes that the Owner was directing were confirmed through the progress reports and the changes were confirmed by the Owner through phone calls and email correspondence authorizing additional costs and changes as the new design for the house was constructed.  *See, Exhibit G; Progress Reports and Change Orders; e.g. BCI00001, et. al.*

In addition the Owner was provided with written change order summaries in addition to the price estimate.  These change order summaries were very detailed.  Exhibit G, Detailed spreadsheet of changes compiled by Bontecou Construction and provided to Charles Haden January 26, 2007, Bates Page Number BCI000038-41.  These were furnished to the summary reports which confirmed the changes described in the progress reports, the email correspondence and the monthly bill were confirmed in the change order summary reports provided to the

Owner.  Exhibit G.  In the face of this detailed evidence it is not credible for the Owner to assert that somehow the additional work was not performed by Bontecou Construction.

Nadowessioux entered into an implied-in-fact contract to have Bontecou Construction perform work beyond the original contract price on a new set of plans.  Exhibit G. The parties had an implied-in-fact contract for Bontecou to perform the additional work for the benefit of Nadowessioux.  Exhibit G.  In particular Nadowessioux and Bontecou Construction manifested mutual intent to enter into a contract for Nadowessioux to pay Bontecou Construction for additional work on the Amangani Villa.  Exhibit G. This manifestation is clearly evident by the items listed below, including, but not limited to, Nadowessioux's payment of monthly bills which included additional work outside of the original the Galambos 2003 plans and work on the Galambos 2007 plans.  Exhibit G.  In addition the new plans, drawn by Galambos, at the request of Nadowessioux and its' representatives, are independent evidence of their mutual intent to enter into a contract to pay Bontecou for the additional work.  Likewise, Nadowessioux and its' representatives knew, or had reason to know, that their conduct in drawing new plans and directing changes and additions from the original project from the original bid would cause Bontecou Construction to infer an agreement that they would be paid for additional work they would perform.  Exhibit G; Exhibit C.  The parties thus entered into an implied-in-fact contract and under that implied-in-fact contract Nadowessioux is obligated to pay Bontecou Construction for the additional work.

The existence of a contract does not depend on the subjective intent of the parties, but rather upon the outward manifestations of a party's agreement sufficient to create reasonable

reliance by the other party.  Exhibit G.  The legal effect of expressed contracts and implied-in-fact contracts is identical; the distinction is based on the way in which mutual assent is manifested.  See 1 *Williston on Contract*, §1:5 (4th Ed. 1989).  *Burt v. Wells Fargo Home Mortgage, Inc.* 75 P.3d 640,649 (Wyo. 2003); *Dobson v. Portrait Homes Inc.* 117 P.3d 1200, 1205 (Wyo. 2005); *Continental Insurance v. Pagent Engineering Co.,* 783 P.2d 641, 651 (Wyo. 1989).  The Court also has the power to reach the just result by merging the implied-in-fact new contract terms with the terms in the parties' original agreement and reach the same result. *Hydro-Hercules Corp. v. Gary Excavating, Inc.,* 166 Conn. 647, 353 A.2d 714, 717 (Conn. 1974) (Court enforced and merged two original contracts and the parties verbal agreement, therefore an implied contract was not needed to allow recovery).  See also, *Hydro-Hercules Corp*, 166 Conn. at 653 ('The intention of the parties manifested by their words and acts is essential to determine whether a contract was entered into and what its terms were. *Nutmeg State Machine(ry) Corporation v. Shuford, 129 Conn. 659, 661, 30 A.2d 911, 147 A.L.R. 1168.*).

**Nadowessioux's Payments for Additional Work**

Nadowessioux's conduct in redesigning the Villa, supervising and paying for the extra work is clear and unequivocal evidence of Nadowessioux's intention to modify the terms of the parties' original contract. Exhibit E; Exhibit G.  See also, Stanley's Cafeteria, Inc. v. Abramson, 306 S.E.2d 870 (Va.1983).

**Authorization from Architect and Agent for Nadowessioux for Additional Work**

As a matter of agency law, Nadowessioux was the principal of its agent, John Galambos, its architect for the Amangani Villa project.   Mr. Galambos directed new, modified and

additional work, and that additional work is the legal responsibility of Nadowessioux. Nadowessioux is vicariously liable for his agent's actions.  *SOS Staffing Service v. Fields,* 54 P.3d 761 (Wyo. 2002).

Any changes directed by the architect, are essentially the same as those directed by the owners.  The legal result being that Nadowessioux is responsible for the work Bontecou performed as directed by them or the architect and should be required to compensate Bontecou for all of his work.  *Tupelo Redevelopment Agency v. Gray Corp., Inc.,* 972 So.2d 495 (Miss.2007)(A contractor who fails to procure a written change order may recover if the extra work was orally ordered, requested, directed, authorized or consented by the owner or his duly authorized agent.).  John Galambos directed and designed new work and Nadowessioux's representatives supervised and directed the construction of the extra work on the Villa.  See Affidavit of Steve Bontecou, Exhibit C; Affidavit of Terry Ross, Exhibit D.  Nadowessioux has received the benefit of the additional work that its architect designed and drew and Nadowessioux should be required to pay for the work it requested.

## WYOMING CONTRACT LAW

### A.  Standard of Review--Question of Law

In Wyoming, as in many jurisdictions, the trial court follows a familiar path when interpreting or construing a contract.  The primary focus is on determining the intent of the parties to the contract.  The initial question is whether the language of the contract is clear and unambiguous.  If it is, then the trial court determines the parties' intent from the contract language.  It does not consider extrinsic evidence, although it may consider the context in which

the contract was written, including the subject matter, the purpose of the contract, and the circumstances surrounding its making, all to help ascertain what the parties intended when they made the contract.  These issues, determining the parties' intent from the unambiguous language, and enforcing the contract in accordance with its plain meaning, involve questions of law for the trial court.  _Fox v. Wheeler Elec. Inc._, 2007 WY  171 ¶10, 169 P.2d 875, 878 (Wyo. 2007).   The Court can decide the underlying contract claim as a matter of law.  _Davison v. Wyoming Game and Fish Com'n_, 238 P.3d 556, 560 (Wyo. 2010).

**B.     The parties' original signed contract is ambiguous.**

The Court has the power to determine questions of law and rule on the terms of a contract.  Bontecou submits to the Court that the terms of the parties' original contract were in fact ambiguous and certainly became ambiguous when Nadowessioux redesigned the Villa after the bid and contract.  When there is not a reasonable dispute as to the material facts, the Court can interpret the ambiguities in the contract and rule as a matter of law that Bontecou is contractually entitled to the money it spent and invoiced to complete Nadowessioux's Amangani Villa, by applying the underlying contract and the implied-in-fact contract which resulted from Nadowessioux's actions after the new plans for the redesigned Villa were issued.

Nadowessioux's redesign of the Amangani Villa changed the terms of the parties' original contract and created ambiguities which could not be reconciled by the initial standard form written contract.  The Court's first step in interpreting any contract is to look at the contractual language and decide whether it is clear or ambiguous.  _Asherman v. Asherman,_ 221 P.3d 302 (Wyo. 2009).

Nadowessioux's actions in modifying the key terms of the contract shortly after it was signed, led to the ambiguities in the original contract.   Exhibit C; Exhibit G. The evidence shows that Nadowessioux actually redesigned the Villa after acquiring the bid from Bontecou on a completely different set of plans. Exhibit G.   As a result of the ambiguities created by Nadowessioux's actions, the Court is to consider the extrinsic evidence surrounding the construction of the Villa.    An ambiguity can range from obscure language, terms of indefiniteness, or terms that would cause one to conclude the contract may have a double meaning.  Such ambiguities are regularly found in contract cases and put in the Court's objective hands to resolve as questions of law.  _Amoco Production Co. v. Stauffer Chemical Co. of Wyoming,_ 612 P.2d 463 (Wyo. 1980); _Farr v. Link,_ 746 P.2d 431 (Wyo. 1987); _Ferguson v. Reed,_ 822 P.2d 1287 (Wyo. 1991); _Hansen v. Little Bear Inn Co.,_ 9 P.3d 960 (Wyo. 2000).

A leading and often cited case in Wyoming on the admission of parol or extrinsic evidence in resolving ambiguities arising from contract cases is _Bulis v. Wells_, 565 P.2d 487, 490 (Wyo. 1977):

> ". . . It is well settled that where a written instrument is ambiguous parol evidence is admissible to ascertain its meaning, although it may not add to or detract from the writing. _32A C.J.S. Evidence_ s 959(1)a, p. 374; 20 _Am.Jur., Evidence,_ s 1147, p. 999; _17 Am.Jur.2d, Contracts,_ s 77, pp. 417, 418_; 17A C.J.S. Contracts_ s 597, p. 1163. As to the meaning of an ambiguous contract, see 3 _Words and Phrases_, p. 443 (1953). Also, we announced the rule in _Goodman v. Kelly, Wyo., 390 P.2d 244, 247,_ that if a contract were ambiguous resort might be had to competent evidence of extraneous circumstances that tend to explain the ambiguity and further illustrate the intention of the parties at the time the provisions were adopted."

In _Bulis_, the Court affirmed the lower court's ruling wherein it admitted extrinsic evidence in an effort to surmise the meaning of an ambiguous option clause in a lease renewal

contract and the parties' intent was examined in conjunction with the contract. _Bulis_ at 490, 491.

Based on _Bulis_ and other Wyoming case law, the extrinsic evidence of Nadowessioux's redesign

is the path the Court may choose to follow in this case.  The redesign, new cost for completion of

the home, and modified timeline, all choices made by Nadowessioux, clearly led to several

ambiguities in the parties' original contract.  These ambiguous terms were then replaced by the

implied-in-fact contract that Nadowessioux created through its actions as the construction of the

redesigned Villa moved forward.  Exhibit G; Exhibit C; Exhibit D .

    In _Fox v. Wheeler Elec. Inc._, 169 P.2d 875, 878 (Wyo. 2007), the Wyoming Supreme

Court recognized that contract interpretation is a question of law for the Court with the test being

an objective one, as to what a reasonable person would have intended from the plain meaning of

the terms of a contract.  This objectivity allows the Court to determine the intent of the parties in

conjunction with the contract.  _Amoco Production Co. v. Stauffer Chemical Co. of Wyoming_, 612

P.2d 463 (Wyo. 1980); _Reed v. Miles Land and Livestock Co._, 18 P.3d 1161 (Wyo. 2001); _True

Oil Co. v. Sinclair Oil Corp._, 771 P.2d 781 (Wyo. 1989); _Shrum v. Zeltwanger_, 559 P.2d 1384

(Wyo. 1977).

### C.    The parties implied-in-fact contract, regarding the redesign and changed contract terms, is unambiguous.

    Because the parties entered into an implied-in-fact contract that is unambiguous, the

parties' original contract and the implied-in-fact contract should be interpreted and enforced as a

matter of law.  The implied-in-fact contract replaced the ambiguities that Nadowessioux created

in the parties' original contract when it redesigned the Villa and both agreements can now be

easily interpreted regarding price.  When Nadowessioux redesigned the Villa and supplied new

plans, directed and supervised construction of those new plans and reviewed and paid change

order documentation and paid monthly bills, Nadowessioux created an implied-in-fact cost-plus

contract without a maximum guaranteed price.

The *Omohundro v. Sullivan,* 202 P.3d 1077, 1084-85 (Wyo. 2009), case provides further

insight on using additional evidence to determine the parties' intent, even when terms are

unambiguous.  Since the body of law on covenants is identical to the on contracts, the findings

from the *Omohundro* court are helpful in this case:

> [E]ven if a contract is unambiguous, we can examine evidence of the
> circumstances surrounding the execution of the deed to arrive at the parties' intent.
> *Hickman,* ¶¶ 6-11, 71 P.3d at 257-58. Relevant considerations may include the
> relationship of the parties, the subject matter of the contract, and the parties'
> purpose in making the contract. *Id.*

*Omohundro* at 1084 (citing *Ecosystem Res. L.C. v. Broadbent Land & Res*., *L.L.C*., 2007

WY 87, ¶ 10, 158 P.3d 685, 688 (Wyo. 2007).

Nadowessioux's actions and course of conduct manifested its intent to create an implied-

in-fact contract which caused Bontecou to infer an implied-in-fact contract, essentially, that

Bontecou would be paid for the work performed for Nadowessioux.  In *Dobson v. Portrait

Homes,* 117 P.3d 1200, 1205 (Wyo. 2005), the Court considered the disputed settlement

agreement terms between a property owner and a materialman.   A settlement agreement is a

contract, and the contract law analysis in *Dobson* is applicable to the implied-in-fact contract that

resulted in the Bontecou case.   *Dobson* at 1204.   The court carefully considered the parties

objective acts:

> In Wyoming, we examine the objective manifestations of the parties'
> contractual intent to determine whether a contract was formed. *McDonald v.*

*Mobil Coal Producing, Inc.*, 820 P.2d 986, 990 (Wyo.1991). "Under the 'objective theory' of contract formation, contractual obligation is imposed not on the basis of the subjective intent of the parties, but rather upon the **outward manifestations of a party's assent sufficient to create reasonable reliance by the other party**." *Id.* A party's intention will be held to be what a reasonable person in the other party's shoes would conclude his manifestations to mean. *Shrum v. Zeltwanger,* 559 P.2d 1384, 1387 (Wyo.1977).

*Givens v. Fowler,* 984 P.2d 1092, 1095 (Wyo.1999). A contract can be formed where one party lacks subjective intent, but nevertheless **proceeds as if there were a contract**. *McDonald v. Mobil Coal Producing, Inc.,* 820 P.2d 986, 990 (Wyo.1991). " 'The **conduct of a party may manifest assent even though he does not in fact assent**.
*Dobson* at 1205. (emphasis added).

As the Villa was being redesigned by Nadowessioux and as the new plans were issued and built, there clearly was mutual assent to the terms of the new implied contract established by the Nadowessioux's actions, Bontecou's reliance on the same in providing cost estimates, detailed change order reports and building the new plans established the implied-in-fact contract. Exhibit G; Exhibit C.  The implied-in-fact contract is established by Bontecou's continuing to perform work on the Amangani Villa, and Nadowessioux's continued payment of bills upon directing changes that drove the price of the Villa beyond the original guaranteed maximum price. Exhibit C; Exhibit E.  The evidence of this course of conduct by the parties' without a doubt establishes the implied-in-fact contract that should be enforced by the Court.  Exhibit E; Exhibit G.  The parties' actions manifested their mutual assent to the new scope of the Villa and the additional cost of the changes and created the new contract for completing the work on a cost plus basis outside of the guaranteed maximum price in the original contract as recognized under Wyoming law.  *Brit v. Wells Fargo Home Mortg., Inc.,* 75 P.3d 640, 647-648 (Wyo. 2003).

In essence, an implied-in-fact contract may arise where "parties act in a

manner conveying mutual agreement and an intent to promise...." _Worley v. Wyoming Bottling Co., Inc._, 1 P.3d 615, 620 (Wyo. 2000). **Interpretation of an unambiguous implied-in-fact contract is a question of law.** _Garcia v. UniWyo Federal Credit Union_, 920 P.2d 642, 645 (Wyo. 1996).

_Brit_, at 649 (Emphasis added).

Bontecou turns to the Court to finally and fairly enforce the implied-in-fact contract created by Bontecou and Nadowessioux. The questions that remain are questions of law, appropriate to be decided by this Court.

# NADOWESSIOUX'S ARGUMENTS TO AVOID PAYING BONTECOU FOR THE WORK

1. **Nadowessioux's Claim that it does not have to pay for the work it requested because its representative did not sign the Change Orders--Habitual Disregard and Waiver.**

Nadowessioux claims it does not have to pay for the work because its representatives failed to sign written change order forms for the extra work. However, Nadowessioux cannot credibly make that argument given the record. Exhibit G; Exhibit C; Exhibit E. Nadowessioux repeatedly ignored the requirements of the A201 contract which required its architect to submit change orders to the owners for their signature. Exhibit F. Contrary to the parties' original agreement, the extra work proceeded as directed by Nadowessioux and Nadowessioux paid pay applications for the extra work to Bontecou Construction without signed written change orders. Exhibit E; Exhibit G. Wyoming law is clear that the approach taken by Nadowessioux waived the formal change order process contained in the parties' original agreement.

In specifically addressing change orders, the Wyoming Supreme Court has held that when an owner orders additional and changed work and allows the work to proceed without fully

executed change orders, such "habitual disregard" of the written change order requirement waives the formal change order requirement. *Huang International, Inc. v. Foose Construction Co.,* 734P.2d 975, 977-978 (Wyo. 1987).  Other courts agree that the owner's habitual disregard of a change order provision constitutes waiver of the requirement for formal change orders. *Penava Mechanical Corp. v. Afgo Mechanical Services, Inc.,* 896 N.Y.S.2d 349 (N.Y.App.Div.1.Dept. 2010) (Oral directions to perform extra work, or the general course of conduct between the parties, may modify or eliminate contract provisions requiring written authorizations for additional work); *Bonvillain Builders, LLC v. Gentile,* 29 So.3d 625 (La.App.1.Cir. 2009)(Written contracts for construction may be modified by oral contracts and by the conduct of the parties, and this is true even when the written contract contains the provision that an owner is liable only if the change orders are in writing); *Tupelo Redevelopment Agency v. The Gray Corp. Inc.,* 972 So.2nd 495, 508 (Miss. 2007)(finding waiver of change order requirement based on consideration of owner's knowledge of, agreement to or acquiescence in extra work, a course of dealing that repeatedly ignored change order requirement; a promise to pay for the extra work and performance in reliance on that promise); *Inland Const. Co. v. Cameron Park II, Ltd. LLC* 640 S.E.2d 415, 418 (N.C. App. 2007) (lack of change order did not preclude property owner from being responsible for the cost of additional heating, ventilation and air conditioning requested by owner and architect); *Runnells v. Quinn,* 890 A.2d 713 (Me. 2006); *Mith-Hunter Constr. Co. Inc. V. Hopson*, 616 S.E.2d 4419, 421(S.C. 2005) (homeowner waived change order requirement where homeowner authorized work for which invoice was submitted, knew the work was being done, and accepted the benefit of the work); *Flooring*

_Systems, Inc. v. Staat Const. Co.,_ 100 S.W.3d 835 (Mo.App.E.Dist. 2003) (Waiver of a written change order requirement in construction contract may be accomplished by either habitual acceptance of work completed upon oral change orders or by presenting evidence that the parties agreed to the changes and the changes were completed.); _Recon Car Corp. of New York v._ _Chrysler Corp.,_ 515 N.Y.S.2d 829  (N.Y.App.Div.2.Dept. 1987)(Modifications of written contracts may be proved circumstantially by the conduct of the parties.);

 _W.E. Garrison Grading Co. v. Pracci Const. Co. Inc.,_ 221 S.E.2d 512, 516 (N.C. App. 1975) (where additional work performed at request of and under supervision of owner's engineer, owner held responsible for extra work).  See also, _Jensen v. Fremont Motors Cody, Inc.,_ 2002 WY 173, ¶ 16, 58 P.3d 322,327 (Wyo. 2002) (and cases cites therein).

2.   **Haden/Nadowessioux-  Claims for Credits or Offsets after the fact**

Predictably, Nadowessioux will attempt to claim that the Court cannot quickly resolve these issues and cannot resolve them on summary judgment because Nadowessioux is owed credits on the project.  Although there were some relatively insignificant cost savings, those credits were provided when the change occurred.  _See,_ Affidavit of Steve Bontecou_,_ Exhibit C. _See,_ Affidavit of Terry Ross, Exhibit D. The vast majority of the changes were costly and resulted in upgrades to the project and likewise the cost.  _See,_ Affidavit of Terry Ross_;_ Exhibit D. _See_, Affidavit of Steve Bontecou_,_ Exhibit C.  In fact, Nadowessioux did not make any written claims for credit during the project and certainly no claims for credit that had not already been given during the project. Id.  Instead, after the fact, when Bontecou Construction was attempting to get paid for the work it had done, Nadowessioux, for the first time, after the work was done

asserted that it was owed credits in, ironically, nearly the identical amount that Bontecou Construction needed to be paid for the work it had performed for Nadowessioux.

While Nadowessioux will attempt to make much of supposed credits that it did not claim until after it had the benefit of the completed Villa, the credits are not only factually invalid but Nadowessioux's position is also invalid under the contract.  Under the A201 General Conditions Exhibit to the Contract, either party, including the Owner, that wants an adjustment in payment of money due must make a claim.  The Owner must make the claim within twenty-one (21) days after the occurrence of the event giving rise to the claim. §4.3.2, Paragraph 19, A201, <u>Exhibit F</u>. Specifically §4.3.2 provides:

> "Claims by either party must be initiated within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later.  Claims must be initiated by written notice to the Architect and the other party."

Thus, even of Nadowessioux could factually support their defense to payment of supposed credits (which they cannot) that claim would be barred by the 21 day time limit contained in the Contract.

An argument similar to Nadowessioux's argument for credits was considered in *Bellevue Technology Tower, LLC v. DPR Const., Inc.*, 125 Wash.App. 1003, Not Reported in P.3d, 2005 WL 39813, p. 7, Wash.App.Div. 1, 2005), where the Court concluded that when a claimant waits "well after the 21-day time limit in A201," no equitable adjustments can be allowed or given in accordance with A201.

Bontecou urges this Court reach the same logical conclusion when it interprets the 21-day time limit in the AIA A201 document, and determine that Nadowessioux's late claims for credits or offsets are barred by the 21-day rule.

3. **Nadowessioux's assertion that Bontecou should not be paid ignores the undisputed fact that Bontecou paid all subcontractors**.

Bontecou Construction paid the subcontractors and the vendors to do the work for Nadowessioux on the Cadillac version of the Villa.   However, Nadowessioux has not paid Bontecou Construction the money Nadowessioux owes Bontecou Construction.   Exhibit C; Exhibit D.

## CONCLUSION

WHEREFORE, Bontecou Construction, Inc. prays that the Court (I) deny the Debtor's Motion for Partial Summary Judgment and deny the Debtor's Objection to   Bontecou Construction's claim and find instead that Bontecou Construction is owed the full amount of its claim of $854,972.34; and that the Court award Bontecou Construction the amount it is owed for work performed on the Amangani Villa for Nadowessioux and award Bontecou Construction its interest and attorney's fees and (ii) grant such further relief, at law or in equity, to which Bontecou Construction, Inc. may be justly entitled.

Respectfully submitted,

THE RICHARD LAW FIRM, P.C

*/s/ Andrea L. Richard*
Andrea L. Richard, Attorney
The Richard Law Firm
P.O. Box 1245
199 East Pearl Avenue, Suite 102
Jackson, WY 83001-1245
Telephone:  307-732-6680
Facsimile:  307-732-6638
Email Address:   Andrea@ARichardLaw.com
*Admitted Pro Hac Vice*
**CO-COUNSEL FOR
BONTECOU CONSTRUCTION, INC.**


*/s/ Simon Mayer*
David J. Askanase       TBN 01390000
daskanase@hwa.com
Simon Mayer            TBN: 24060243
smayer@hwa.com
HUGHESWATTERSASKANASE, L.L.P.
333 Clay Street, 29th Floor
Houston, Texas 77002-4168
Telephone: 713-759-0818
Facsimile:  713-759-6834
**ATTORNEYS FOR
BONTECOU CONSTRUCTION, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 28, 2011, a true and correct copy of the foregoing *Bontecou's Memorandum in Support of its Claim – Nature and Underlying Contract* was served by ECF electronic filing notice and/or U.S. First Class Mail, postage prepaid to the party listed below.

***Attorneys for Debtor***
EDWARD L. ROTHBERG
ANNIE E. CATMULL
HOOVER SLOVACEK LLP
5847 San Felipe, Suite 2200
Houston, Texas 77057

*/s/ Simon R. Mayer*
Simon R. Mayer